ROBERT R. POWELL, SBN: 159747
**POWELL & ASSOCIATES**
925 West Hedding Street
San Jose, California 95126
T: 408-553-0201 F: 408-553-0203
E: rpowell@rrpassociates.com

SAMUEL H. PARK (SBN: 261136)
**Attorney at Law**
148 Pacific Ave., #2
Pacific Grove, CA 93950
T: (831) 529-5955
sam@sampark.lawyer

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**ROBERT T. MATSUI UNITED STATES COURTHOUSE**

| | |
|---|---|
| McKenzie Olivares, individually and as Guardian ad Litem for minors W.O. and M.D., Dylan Olivares, individually and as Guardian ad Litem for the minor child S.O., <br><br> Plaintiffs, <br><br> v. <br><br> County Of Stanislaus, Ophelia Nguyen, Jeremy Pannell, Eric Anderson, Courtney Mummert, Kimbery Potter, Does 1 through 10 <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR CIVIL RIGHTS VIOLATION [42 U.S.C § 1983]** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## **INTRODUCTION**

1.     Plaintiffs brings this suit for violation of Plaintiffs' constitutional rights of familial association and privacy by the County of Stanislaus due to its constitutionally deficient and/or non-existent training and constitutionally violative practices, carried out through individual employees of the County of Stanislaus County Community Services Agency, all as related to the removal of minors, W.O., S.O., and M.D. from their parents, McKenzie Olivares and Dylan Olivares without due process of law in March of 2021.

2.    Plaintiffs allege that the minor M.D. was removed from McKenzie Olivares without her consent, without a court order, and in the absence of exigent circumstances.

3.    Plaintiffs allege that the removal of minors, S.O. and W.O. was based on deliberately fabricated evidence and perjured statements, as well as numerous omissions of material exculpatory information in an affidavit in support of a custody warrant.

## JURISDICTION

4.    The Court has original jurisdiction over the claims alleged herein because they arise under the Fourth and Fourteenth Amendments to the United States Constitution.

5.    Pursuant to 28 U.S.C. section 1367(a), the Court also has supplemental jurisdiction over the state law claims herein, which are so related to the vindication of constitutional rights that they form the same case or controversy.

## VENUE

6.    Venue is proper in this judicial district because all defendants are residents of California and the events or omissions giving rise to Plaintiff's claims occurred in the County of Stanislaus, State of California.

## PARTIES

**Plaintiffs**

7.    Plaintiff, MCKENZIE OLIVARES ("McKenzie"), is an individual who at all times relevant resided in the County of Stanislaus. McKenzie is the biological mother of minors, W.O. and M.D. She is the adoptive mother of minor, S.O.

8.    Plaintiff, DYLAN OLIVARES ("Dylan"), is an individual who at all times relevant resided in the County of Stanislaus. Dylan is the biological father of minors, W.O. and S.O. He is also M.D.'s stepfather.

9.    Plaintiff, M.D., is a minor born August of 2012 who at all times relevant resided in the County of Stanislaus. At the time of the events alleged herein, M.D. was 8 years old. The true name of the minor is replaced with the initials M.D. to protect his privacy.  The Plaintiffs will seek appointment of McKenzie as the Guardian ad Litem for M.D. at or near the time of filing this Complaint.

COMPLAINT FOR CIVIL RIGHTS VIOLATION

10. Plaintiff, S.O., is a minor born June of 2014 who at all times relevant resided in the County of Stanislaus. At the time of the events alleged herein, S.O. was 6 years old. The true name of the minor is replaced with the initials S.O. to protect his privacy. The Plaintiffs will seek appointment of Dylan as the Guardian ad Litem for S.O. at or near the time of filing this Complaint.

11. Plaintiff, W.O., is a minor born December of 2019 who at all times relevant resided in the County of Stanislaus. At the time of the events alleged herein, W.O. was 1 years old. The true name of the minor is replaced with the initials W.O. to protect his privacy. The Plaintiffs will seek appointment of McKenzie as the Guardian ad Litem for W.O. at or near the time of filing this Complaint.

**Defendants**

12. Defendant COUNTY OF STANISLAUS ("COUNTY") is a political subdivision of the State of California. The Community Services Agency (CSA) is an administrative subdivision of the COUNTY with the stated mission of "protecting children and families and adults and assisting families towards independence and self sufficiency." Within the CSA, the Child & Family Services Division (CFS), is responsible for discharging the COUNTY's child welfare programs and delivering Child Welfare Services (CWS) to residents within the territorial jurisdiction of the COUNTY. COUNTY has in its employment various social workers (SWs) and social worker supervisors (SWS), such as the individually-named defendants identified below. These titles of "CSA" "CFS" and "COUNTY" are all used herein, but all are under the COUNTY for all purposes.

13. Defendant OPHELIA NGUYEN ("NGUYEN") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a social worker in emergency response, acting under color of state law at all times pertinent to the claims set forth herein.

14. Defendant ERIC ANDERSON ("ANDERSON") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a social worker supervisor to NGUYEN, acting under color of state law at all times pertinent to the claims

set forth herein.

15.     Defendant COURTNEY MUMMERT ("MUMMERT") aka COURTNEY THORPE is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a social worker, acting under color of state law at all times pertinent to the claims set forth herein.

16.     Defendant KIMBERLY POTTER ("POTTER") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a social worker supervisor, acting under color of state law at all times pertinent to the claims set forth herein. POTTER was MUMMERT's supervisor in preparing and filing the Juvenile Dependency Petition, acting under color of state law at all times pertinent to the claims set forth herein.

17.     Defendant JEREMY PANNELL ("PANNELL") is a natural person who, at all times pertinent to the events described herein, was employed by the COUNTY as a social worker supervisor to MUMMERT in preparing and filing the Detention Report, acting under color of state law at all times pertinent to the claims set forth herein.

18.     Defendant DOES 1 through 10 are natural persons who, at all times pertinent to the events described herein, were employed by the COUNTY in some capacity in the CFS and were state actors acting under color of state law. The true names and capacities of defendants sued as DOES 1 through 10 are unknown to Plaintiffs and Plaintiffs pray leave to amend to allege the true names and capacities when they are ascertained.

19.     All of the previously identified and individually named Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of each of the other Defendants and were at all times acting within the course and scope of such agency, representation and employment and with the permission and consent of each of the other Defendants.

20.     Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants, including DOES 1 through 10 inclusive, were at all times herein mentioned, acting in concert with, and in conspiracy with, each and every one of the

- 4 -

remaining Defendants in unreasonably doing the things and/or failing to take the appropriate and/or required actions alleged in this Complaint.

21.    Plaintiffs allege that each and every individually named or identified Defendants hereinabove is in some capacity a government actor with the government entity they were employed at the time of the events complained of herein, and in that capacity were operating in taking the actions complained of, and failing to take the actions complained of, as state actors acting under color of law.

**TORT CLAIM NOTICE COMPLIANCE**

22.    The County of Stanislaus was served lawfully with a Government Tort Claim Notice (G.C. 910, et seq.) on September 22nd, 2021 by Plaintiffs regarding the allegations and circumstances set forth herein below related to the removal of the minor plaintiffs from their parents and home.

23.    On November 3rd, 2022 the County of Stanislaus served on Plaintiffs a Notice of the rejection of the claims regarding the removals of the children referred to in the September 22nd, 2021 Government Tort Claim Notice served by Plaintiffs.

**BACKGROUND: JUVENILE DEPENDENCY and COUNTY POLICIES**

*Juvenile Dependency Principles*

24.    The juvenile court is a branch of the California Superior Court specially authorized to administer the Arnold–Kennick Juvenile Court Law, which establishes procedures for handling child abuse and neglect cases. California Welfare & Institutions Code (WIC or W&IC) §§ 200, 245.  It has ultimate and exclusive authority over what happens to children who are at risk of, or have suffered, abuse or neglect while in their parent's or guardian's care. Section 300 describes the specific situations that provide the legal bases for juvenile court jurisdiction (e.g., physical abuse) and authorizes the court to remove children from the care and custody of their parents if such action is necessary to keep them safe. § 366.26.

25.    California's child welfare system operates on a state-supervised/county-administered model. Each of California's 58 individual counties administers its own child welfare

COMPLAINT FOR CIVIL RIGHTS VIOLATION

program, while the California Department of Social Services (CDSS) promulgates regulations governing such programs, provides advice, reviews the child protection services provided by every county child welfare system, and ensures compliance with WIC and CDSS regulations. WIC §§ 10550–10553, 10600, 10601.2(a), 10603, 10605, 10800, 16500, 16501(c) and (f), 16520; CDSS MANUAL OF POLICIES AND PROCEDURES, CHILD WELFARE SERVICES, Div. 31 (MPP) § 31-001.1. CDSS also operates the statewide case management system, known as CWS/CMS, used by county agencies and social workers.

26.    Counties are the primary governmental bodies that directly interact with children and families to address child abuse and neglect. Counties perform these functions through a designated county welfare department, such as COUNTY's CSA and CFS. Within California's child welfare system, Child Welfare Services (CWS) are the major system of intervention of child abuse and neglect. CWS represent a continuum of services. Since 1982, the four traditional components of CWS programs are emergency response (ER), family preservation, family maintenance, and permanent placement.

27.    ER services consist of a 24-hour response system providing the capability to receive and respond to reports of child mistreatment, and counties must maintain a free public hotline for processing such reports. §§ 16501(a)(8), 16504(a); MPP § 31-015. When county hotlines receive a report, an emergency response referral ("referral") is generated. MPP § 31-002(c)(9). Within CWS/CMS, each referral is identified by a unique serial number; each child is also associated with a unique serial number.

28.    The hotline, using criteria from CDSS and their respective county, must then determine whether the referral's allegations warrant an in-person response or can be evaluated out of the system (or "evaluated out")—in which case no investigation occurs. WIC § 16504(a); MPP § 31-002(c)(8), 31-101.3, 31-105. If an in-person response is required, the referral is assigned to an ER-specialized social worker for investigation. Regulations requires the social worker to make in-person contact with the allegedly-abused minor and at least one adult with information about the allegations. MPP §§ 31-125.2

through 31-125.221. Social workers are required to document their investigation in delivered service logs (DSLs), which are stored in CWS/CMS.

29.    At the end of the investigation, the investigating social worker must determine whether the report of abuse or neglect is (1) unfounded, i.e., the report is "determined to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect, as defined in [Cal. Penal Code §] 11165.6," (2) substantiated, i.e., the report constitutes child abuse or neglect as defined by § 11165.6 "based upon evidence that makes it more likely than not that child abuse or neglect, as defined, occurred," or (3) inconclusive, i.e., the report is determined "not to be unfounded, but the findings are inconclusive and there is insufficient evidence to determine whether child abuse or neglect, as defined in [§] 11165.6, has occurred." Cal. Pen. Code § 11165.12(a)–(c).

30.    If the allegations are substantiated, the referral is promoted to a case, resulting in further involvement from the county child welfare agency and possible judicial proceedings. If the department decides to remove a child from parental custody, a warrant authorizing the removal is ordinarily required—like any seizures of a person under the U.S. Constitution.

31.    In all cases, however, detention of a child requires the social worker to file a verified juvenile dependency petition in compliance with the WIC §§ 325–342, which initiates legal proceedings to declare the child a dependent of the juvenile court under WIC § 300. Section 300 lists specific situations (e.g., sexual abuse, neglect, caretaker absence) that will bring a child within the jurisdiction of the juvenile court.

32.    The petition must allege the specific subdivision of § 300 supporting jurisdiction; it must contain a concise statement of facts, separately stated, to support the relevant subdivision; it must provide notice of the specific factual allegations against a parent; and it must be verified.

33.    The dependency petition must be filed within 48 hours of the removal of a child from parental custody. Thereafter the juvenile court must also hold a hearing (the "Detention Hearing") to determine whether the child should remain detained, and that hearing must be

held by W&IC statutes, no later than the end of the next court day after the petition is filed. In advance of the detention hearing, the child welfare department must file a Detention Report with the juvenile court providing the results of the alleged investigation. Later, the merits of the dependency petition (i.e., whether its allegations are true) are litigated in a "jurisdiction hearing," for which the child welfare agency must file a "jurisdiction report." Other hearings follow, requiring additional reports be filed by the child welfare agency, as the juvenile dependency case winds toward either of two ultimate outcomes: reunification of the family, or else loss of parental rights.

34.    Under federal law, the Petition, the Detention Report, and all filings in a juvenile dependency proceeding, as well as all representations made by agency personnel to the Court must be truthful, thorough, and accurate, and the 9th Circuit Court of Appeals has held there is no such thing as a minor amount of actionable perjury or of false evidence that is permissible in juvenile dependency proceedings. *Hardwick v. County of Orange*, 844 F.3d 1112 (C.A.9 (Cal.), 2017)

35.    When social workers draft warrant applications, petitions for jurisdiction under W&IC 300 and other juvenile court reports, the information for such reports is often drawn from CWS/CMS, particularly if there is prior history with a child welfare agency, or the family is on any form of welfare, and those applications, petitions, and various reports are drafted relying on notes and representations made by other social workers, sometimes with the same child welfare agency, sometimes not.

36.    For example, when a social worker investigates a referral, s/he is required to record the nature of any interactions with parents or other contacts into CWS/CMS—including what the participants in the interaction states, what the social worker observed, the date of the interaction, participants in the interaction, and the location. Social workers also document internal staff meetings in CWS/CMS. Moreover, when social workers are working in CWS/CMS on a particular case, the database has a feature that permits the social worker to view the entire child welfare history of the child and the alleged abuser.

37.    The CWS/CMS also provides persons who are authorized to log in to it, with

information on how prior referrals were handled, when they arose, who was involved,

38.    The information in CWS/CMS (and its accuracy) is especially important where the social worker drafting the court reports, such as the Detention Report filed in this matter by MUMMERT and supervisor PANNELL, is not the same social worker who made the initial investigation—as happened in this case.

39.    Further, the COUNTY has apparently recently implemented a procedure for obtaining protective custody warrants.  It is known to Plaintiffs that for many years until at the very least July of 2019, the COUNTY had no training, or at best inadequate training on the existence, appropriate use, and lawful requirements under state law and regulation as well as federal law, regarding obtaining protective custody warrants.

40.    As a result, until at least July of 2019, COUNTY and its CFS employees routinely removed children from their parents in the absence of an imminent risk of serious bodily injury so imminent that there is insufficient time within which to obtain a warrant, and, when there are reasonably available lesser intrusive means available to protect the child[ren] from any perceived risk of imminent serious bodily injury.

**41.**    As the facts and circumstances of this case are alleged, the unlawful warrantless removal of children continues in the County of Stanislaus.  To be clear, the failure to obtain a warrant under circumstances that would require obtaining a warrant to remove a child actually extends to the events of March 2021 involving this family, for indeed M.D. was removed without a warrant in the absence of any imminent risk of serious bodily injury.

## **COMMON FACTS**

42.    As of 2021, when these events described below that involve COUNTY employees began, McKenzie and Dylan shared a home in the County of Stanislaus.  They had moved to the home in Turlock in the November/December 2019 timeframe due to an employment opportunity for DYLAN.  Previously, they lived in Ventura County of California, which is where the appointment with and testing performed by Dr. Lee – discussed below – occurred.

43.    At all times relevant to this Complaint, McKenzie, Dylan, M.D., S.O., and W.O. comprised a loving family unit, entitled to protection under the Fourth and Fourteenth Amendments to the United States Constitution.

44.    Although McKenzie shared custody of M.D. with the child's biological father, she had sole physical custody of M.D. M.D.'s father resided in Simi Valley, California and his father he saw him at holidays and 3-day weekends.

45.    When S.O. was approximately 8 months old, his biological mother left S.O. with Dylan to pursue a life of drug addiction. In 2017, Dylan received a judgment for sole legal and physical custody of S.O.

46.    Even before McKenzie and Dylan were married, S.O. asked McKenzie if he could call her "mom."  McKenzie and Dylan agreed that McKenzie should adopt S.O. S.O.'s biological mother did not contest the adoption, which then finalized in November of 2019.

47.    Early in S.O.'s life both Dylan and McKenzie noticed that S.O. had unusual feeding behaviors. S.O. had a voracious appetite that was clearly out of the ordinary. By the time he was 3 years old, he could eat a full adult-sized meal and still want to eat more. S.O. began sneaking food in large amounts into his room or other places where he could eat it undetected, then lied about his conduct even when candy or cracker wrappers were pulled out from under his bed.

48.    Although at home, S.O.'s food intake was portioned, the child often returned from the care of other relatives or family friends sick from eating too much food and vomiting.

49.    While the family lived in Ventura County, before their move to Turlock, McKenzie was actively involved in each of her children's educational upbringing and regularly volunteered at each of their schools.

50.    When S.O. began preschool, she noticed that his eating behavior differed from the other children.  At school luncheons, she noticed that S.O. would eat massive quantities of food in comparison to the other children, often several plates of food, to the point that he would vomit afterwards.

COMPLAINT FOR CIVIL RIGHTS VIOLATION

51.    When S.O. began kindergarten, McKenzie became a "parent volunteer" in M.D. and S.O.'s classes at school.  During that time McKenzie noticed that, instead of playing with other children on the playground, S.O. would often spend the time eating. S.O. also began rummaging through trash cans at the school looking for uneaten food. The parent of another student informed McKenzie of this abnormal behavior.

52.    McKenzie and Dylan sought medical attention to gain an understanding of S.O.'s condition and treatment goals with Dr. Lee, S.O.'s pediatrician.

53.    Dr. Lee was concerned with the child's weight, which was abnormally high, and gave dietary recommendations to McKenzie and Dylan, including the logical step of limiting S.O.'s amount of food intake.

54.    McKenzie and Dylan followed the doctor's advice and successfully brought S.O.'s weight down to the point that he was no longer obese and was within the normal range. However, S.O. continued to exhibit troubling behavior, including binge eating massive amounts of food when given the opportunity, hiding food, and rummaging through the trash looking for food.

55.    A school nurse also noticed the child's atypical behavior and recommended that McKenzie and Dylan obtain a blood panel.

56.    S.O.'s pediatrician consulted with an endocrinologist, ordered up a blood panel, and recommended genetic testing. On or about September 12, 2019, a genetic test revealed that S.O. had genetic markers, specifically a leptin receptor deficiency (LEPR deficiency), associated with severe obesity, severe early-onset obesity, and possible morbid obesity based on prior research studies.

57.    Dr. Lee said to monitor S.O. closely, exercise diligent portion control, and provide no seconds, thirds, etc. at meals. Further he recommended, limit snacks and continue with healthy foods.

58.    McKenzie and Dylan regularly consulted with S.O.'s pediatrician to monitor the child's weight and health. Through their early intervention, S.O.'s weight and body mass index were brought down to normal. However, the child continued to have a voracious

appetite and frequently complained about the quantity of food he was given. When given the opportunity, the child also overate on occasion to the point of vomiting.

59.    In November of 2019 the family moved from Ventura County to Turlock, California. S.O. attended a kindergarten that had a limited half-day schedule, which allowed McKenzie and Dylan to monitor and regulate S.O.'s food intake. For part of 2020, S.O. engaged in distance learning due to the Covid-19 Pandemic.

60.    In or about October, 2020, S.O. returned to school for in-person learning at Hickman Charter School.

61.    Due to S.O.'s eating disorder and food allergies, McKenzie and Dylan gave detailed dietary instructions to school administrators and teachers, including that S.O. should only eat the food provided by his parents. McKenzie and Dylan explained to school administrators and staff that S.O. had an eating disorder and that his caloric intake needed to be monitored.

62.    The parents did not tell school officials that S.O. could never engage in a classroom birthday party of special event because of the food that was present at such event, but made it very clear that McKenzie or Dylan were to be contacted before such potentially harmful circumstances were laid out before the child so McKenzie could account for what he was given in the context of what he may have already eaten that day, and to remind the teacher that her son had an eating disorder.

63.    However, the instructions were not followed. Within the first week of S.O. starting at Hickman the sneaking, overeating and binge eating began again. S.O.'s parents noticed and contacted school staff and teacher Susan Hinkelman and explained his medical condition along with past experiences at his former school in Ventura where S.O. ate obsessively and snuck food out of trash (before portion control began).

64.    There were several instances where S.O.'s teachers allowed S.O. to eat food that was not packed by McKenzie and Dylan. S.O.'s parents would find out after S.O. returned from school, sick from eating too much food and vomiting or having an allergic reaction. On other occasions, S.O. would sneak into the bathroom and eat his lunch pack in the morning

while at school. S.O.'s teacher, Mrs. Burkhart, did not follow McKenzie and Dylan's instructions and apparently provided food to the child upon demand.

65.    When McKenzie and Dylan called S.O.'s school to remind the school administrators of the need to strictly monitor S.O.'s diet, S.O's teacher and school administrators seemed defensive and uncooperative. McKenzie and Dylan grew frustrated with the seeming refusal to follow their requests concerning S.O.'s dietary restrictions.

66.    On or about December 10, 2020 CSA received a referral from S.O.'s school, alleging that McKenzie and Dylan would not allow S.O. to have a snack. The referral was evaluated out and did not result in an investigation.

67.    In January of 2020, a neighbor against whom McKenzie and Dylan had made several noise complaints in the past called police after seeing S.O. and M.D. outside in the backyard quarreling and hearing S.O. complaining about being hungry. Turlock Police officers arrived and found no safety concerns. The police officer commented that the parents had "a beautiful home, beautiful children and that [the] children seemed just fine." He apologized for bothering them, told them to have a good night and drove away as the family was leaving to go on their walk. Plaintiffs are informed and believe that a "mandated reporter" heard about this incident and made a referral to CSA on January 19, 2021.

68.    That referral was investigated by NGUYEN, who interviewed S.O. and M.D. NGUYEN could see that the children were fine. After leaving the home, NGUYEN called the parents and told them that she had no concerns and saw no signs of abuse or neglect and stated that the children seemed perfectly fine.

69.    The referral as "unfounded," meaning "a report that is determined by the investigator who conducted the investigation to be false, to be inherently improbable, to involve an accidental injury, or not to constitute child abuse or neglect." See Cal. Pen. Code §11165.12.

70.    On January 20, 2021, CSA received another referral from S.O.'s school, claiming that S.O. was on a strict diet, came to school with minimal food, "appeared skinny," and

that the parents would not allow school staff to weigh S.O. The reporter claimed that S.O. had half of a sandwich and a few carrots for lunch.

71.    Although S.O. was packed a full lunch, S.O. would eat half of his lunch before school began. He would then show his teacher the remaining food and complain that he was given half a lunch. This was a recurring issue that was known to the school based on discussions with McKenzie and Dylan.

72.    None of these conversations between McKenzie and/or Dylan and the school personnel only took place a single time, all were repeated several times before the removal of McKenzie and Dylan's children.

73.    This referral was also "evaluated out" by NGUYEN because the "*Mandated Reporting Party did not have any specific information that minor [was] malnourished*."

74.    In fact, there was nothing wrong with S.O.'s weight; he was well within the normal B.M.I. for children of his age. On January 29, 2021, S.O. had a physical examination where he weighed 44 pounds, which was normal and healthy. On February 12, 2021, S.O. was seen by an otolaryngologist for a ranula that the child had under his tongue. A the visit, S.O. weighed 45 lbs 10.2 oz and had a BMI of 15.65 (56th percentile) with a recorded height of 45.28 inches. S.O. was noted in the medical records as having a healthy and normal appearance.

75.    On March 8, 2021, CSA received another referral from S.O.'s school. The reporting party had a concern that McKenzie was "hypervigilant" about what S.O. ate and would not allow the child to have extra food at school. The reporting party also reported that McKenzie was upset because S.O. ate his sandwich before lunch. The reporting party relayed that S.O. ate out of a garbage can.

76.    Ironically, but in the pattern of these reports that began coming in after the family moved to Turlock, McKenzie had asked numerous times if S.O. had been seen eating out of trash cans and the school administrators and staff all denied ever seeing any such thing.

77.    The investigating social worker discussed said referral with NGUYEN, who had been investigating the referrals made in January. NUGYEN told the investigating social

worker that she planned to close out the referrals because "[*S.O.*] *has had eating issues and his doctor recommended that [the parents] monitor [S.O.'s] eating the way that they do*."

78.    McKenzie and Dylan's relationship with the school staff deteriorated as it was clear that the parents' concerns and clear and simple instructions were not being heeded. During multiple meetings the school teachers, staff, and the school nurse were clearly becoming more adversarial and seemed less interested in discussing the parent's concerns than they were with interrogating them and implying that S.O. was not being well taken care of.

79.    During a meeting on March 11, 2021, School staff asked McKenzie and Dylan to agree to counseling of S.O. to be provided through the school, which the parents responded saying they would talk about that.  They did send an e-mail the following day pointing out they were going to stick with the counselor they had already connected with for that purpose.

80.    They also asked McKenzie and Dlyan if they would sign a release so the school could receive S.O.'s medical records, which was declined.  McKenzie did tell them she would give them the document from Dr. Lee – which she told them they should have because it was in his last school's file – which showed the pediatrician Dr. Lee had asked his food intake be monitored closely in school.

81.    On March 15, 2021, CSA received yet another referral concerning S.O.'s dietary restrictions. This time, the "mandated reporting party" from S.O.'s school reported that S.O. was "*severely underweight*." It was reported that the child's weight was recorded "*at 40 pounds and 48 inches in height within the past month*." However, during the screening process, the reporting party admitted that "*the child has not been diagnosed as underweight at this time*."

82.    The reporting party further reported that the child, who had been questioned by school staff members, was worried he would be disciplined if the school contacted his parents regarding S.O.'s diet. The reporting party suggested that S.O. had previously had marks and bruises in the past that were unreported by school staff to child welfare

agencies. Per CSA records, "*Mandated Reporting Party reported that they are building a case at this time*."

83.    Although CSA social workers knew that McKenzie and Dylan were following doctor's recommendations in restricting S.O.'s diet, the screening social workers, LOPEZ and BRAYFIELD, opened an investigation into the concerns that the food restrictions were motivated by a desire to punish S.O. and that the child had been physically disciplined.

84.    The next CSA referral came a day later, on March 16, 2021. This referral, originating from another "Mandated Reporting Party," stated that S.O. was "underweight" because he was "46 lbs. and 48 inches tall." Even if true, the report established that S.O. was not "underweight" and was in fact normal and healthy from a BMI perspective for his age.

85.    The complaining party stated that McKenzie "refuses to provide information of the doctor that is treating S.O." and that the last physical on file was from October 2019. The reporting party claimed that McKenzie and Dylan sent S.O. to school with "half sandwich and four carrots." The reporting party also stated that the child was "bringing food back up from his stomach, chewing it, and swallowing it again."

86.    That same day, March 16th, 2021, NGUYEN and MASON responded to the family home. McKenzie was wrapped up in a towel when they knocked on the door and had literally started the shower and was about to head into the shower when she heard the knocking.   McKenzie went to the door, in her towel.

87.    McKenzie opened the door slightly and told NGUYEN it was not a good time and asked to set a different time. NGUYEN demanded that they discuss the referral immediately. When McKenzie asked what the allegations were, NGUYEN responded, "I do not need to tell you anything or disclose any information to you." This was against the law. Per California Penal Code 11167(e), NGUYEN was required to inform the parents, "of the complaints or allegations against him or her[.]"

88.    NGUYEN claimed that CSA had received "over 15 calls from people and it has also come to our attention that you have been keeping the kids home from school and that S.O.' food intake is being limited."

89.    McKenzie explained that S.O. had genetic markers that could lead to morbid obesity and that the parents were exercising portion control per the pediatrician's instructions. As for the "missing" days of school, McKenzie explained that the family was on a 10-day quarantine and that the school was already informed and had put together an entire take-home packet for both M.D. and S.O. The children also were not in school that day because McKenzie woke up dizzy and had a migraine that morning.

90.    The discussion lasted approximately 10 minutes, after which McKenzie told NGUYEN that it really wasn't a good time, that she would have her husband Dylan call NGUYEN, and that she would be happy to answer questions at another time.

91.    NGUYEN replied, Well you need to make it a good time. Ms. McKenzie, I would like to ask you some questions about S.O.'s biological mother." McKenzie was shocked, and replied "Okay, first of all super inappropriate," referring to the fact she was saying that at the front door with the children inside in the living room and S.O. having no recollection of anyone as his mother other than McKenzie. She continued, "Second of all I'm not comfortable talking about that and it's really irrelevant so I need to go and take care of my kids. I cannot continue to stand here at the door in a shower towel while they destroy the house. I have answered your questions but you continue to interrogate me for keeping my children home from school for a day and following a doctors recommendations due to my son's medical and food related issues? You refuse to tell me what the allegations are so I'm not really sure what exactly you are getting at. Feel free to call me if you have any further questions."

92.    McKenzie, called Dylan and told him what was going on and he agreed to call get home.  McKenzie then tried two calls to NGUYEN. On the first one, McKenzie told NGUYEN she had to get the baby down for a nap – which was part of her plan before the shower – and NGUYEN said, "I will not discuss my investigation with you, I will speak with Dylan when he gets here, and officers are on the way."  NGUYEN hung up.  When McKenzie called right back, NGUYEN would not answer the phone.

COMPLAINT FOR CIVIL RIGHTS VIOLATION

93.    McKenzie noticed through the window that NGUYEN and a trainee social worker MASON were still in front of her home.  McKenzie stuck her head out the door and said I tried to call you.  NGUYEN's response was, "I don't have time to talk to someone who doesn't care about child abuse and neglect, I will just wait for the police to arrive."

94.     Still the same day, NGUYEN spoke with Dylan by telephone. NGUYEN told Dylan that McKenzie refused to complete the interview and that law enforcement was contacted to assist. Even though Dylan was on the road, he cooperated with NGUYEN and answered her questions. Dylan disclosed that S.O. was evaluated for a food addiction by his pediatrician and that a genetic test and blood work was completed. Dylan disclosed that S.O. was seen by a pediatrician at the Golden Valley Health Center and provided the pediatrician's contact information.

95.    After Dylan arrived home, he continued the interview with NGUYEN outside the home. NGUYEN told Dylan that S.O.'s BMI was low for his age, which was not true. During the conversation, NGUYEN accused McKenzie of lying about keeping the children away from school due to a quarantine and other aspects of NGUYEN's brief encounter with McKenzie. Dylan answered all of NGUYEN's questions truthfully.

96.    NGUYEN interviewed S.O. at the family home. She inquired about the child's diet and about various scratches on the child's arms and face. S.O. described the food he had recently eaten and admitted that he had gotten into trouble for stealing graham crackers. S.O. told NGUYEN that that the scratches were from the family's pet rabbits.  He did tell NGUYEN he had a scab on his nose from jumping on the trampoline.

97.    NGUYEN inquired into the disciplinary measures used by S.O.'s parents. S.O. candidly replied that he was sometimes spanked with a plastic spoon. NGUYEN asked S.O. how he felt at home and S.O. replied "safe."

98.    NGUYEN then asked the six-year-old child, "What do you think safe means?" S.O. replied, "it means I feel protected."

99.    NGUYEN then said "protected is a big word. How did you learn that word?" NGUYEN obviously had no idea that S.O. is very intelligent and often uses big words, or

that his counselor would later comment on how well he communicates and how great his

vocabulary is, or that he loves to read and also spends a lot of time with his mother who

majored in Communications in college; S.O. has been taught to communicate well.

100.   After NGUYEN and the police officers who were there to keep the peace left,

another Turlock police officer (officer ARROYO) arrived.

101.   Officer Arroyo told DYLAN that her coworker from Turlock PD had just finished

his shift and she was taking over and needed to write up the report so asked if McKENZIE

could talk with her for a few minutes about what was going on.

102.   McKENZIE went outside and told officer Arroyo the exact same thing she had told

the school and told NGUYEN, that S.O. has an eating disorder, medical issues regarding

food and weight management and that they had already sought out a counselor as they

were concerned with his behavioral issues and had considered possible autism or

behavioral issues.

103.   Officer ARROYO interviewed S.O. and inquired about the scratches on his face and

arms. Afterwards, Officer ARROYO spoke with McKenzie for another 10 minutes or so

and told her that she had no concerns and didn't see any evidence of abuse or neglect and

that her report would say the same. Arroyo did warn that "CPS's report" was completely

separate so she was not sure what they would say.

104.   The entire time of this event of the NGUYEN and MASON visit, through the police

presence and the interviews, was approximately 4 hours.

105.   On March 19, 2021, NGUYEN spoke with Austin Decker, M.D.'s biological father.

Mr. Decker disclosed that he had cared for S.O. and M.D. in the past and that he had

observed S.O. sneaking food in the home. He also disclosed that S.O. had a habit of

picking at his skin and had scabs. During the meeting, NGUYEN discussed her plan to

remove all three children from McKenzie and Dylan's care, even though none of the

allegations pertained to M.D. or W.O. NGUYEN demanded that Mr. Decker obtain an

emergency custody order for M.D. if he did not want M.D. to wind up in foster care.

106.   CSA closed out the March 16, 2021 referral as "substantiated" for emotional abuse and severe neglect as to S.O. and "substantiated" the referral as to M.O. and W.O. as "at risk, sibling abused," and "general neglect" as to all three children.

107.   On March 21, 2021, McKenzie contacted NGUYEN and informed her that she received the medical records from Dr. Lee and Golden Valley Health Center which showed that S.O. had a healthy weight. McKenzie forwarded copies of the records to NGUYEN via text message.

108.   NGUYEN received the text; McKenzie had sent it not only to NGUYEN, but to Dylan, her father (Robert Becker) and herself. The records she included in the text message showed that S.O. was set up with a counselor (with his name, address and phone number), a nurses note from S.O.'s visit at Golden Valley Health Center on January 29th, 2021 which showed he had a "normal" result including a normal BMI, and it showed an ENT referral for a small lump that had developed under S.O.'s tongue.

109.   Despite having received additional information, on March 22, 2021, NGUYEN along with her supervisor, ANDERSON, applied for a protective custody warrant authorizing the removal of S.O. and W.O. from their parents' care. The warrant application was replete with misrepresentations and omissions of material facts, including:

a.     The misrepresentation that McKenzie and Dylan were "severely restricting S.O.'s diet to the point of malnourishment";

b.     The fraudulent omission of the disposition of the January 20, 2021 referral that S.O. was sent to school with minimal food for lunch and appeared skinny, which was evaluated out because there was no information that the minor was malnourished;

c.     Concerning the March 8, 2021 referral, the fraudulent concealment of the fact that NGUYEN was closing out the earlier referrals because NGUYEN knew that S.O. had "eating issues" and McKenzie and Dylan were following the doctor's recommendations;

d.     For the March 15, 2021 referral, the fraudulent omission that NGUYEN never saw any medical record showing that S.O. was "severely underweight," or that he "was

recorded as weighing 40 pounds and standing at 48 inches in height within the past month";

e.      The critical omission that at no time was S.O. had anything other than a healthy weight per S.O.'s medical records *which were provided to NGUYEN*;

f.      The lie that McKenzie and Dylan "could not provide documentation of S.O.'s history of obesity," when nobody at CSA had given McKenzie or Dylan a reasonable opportunity to obtain a copy of the medical records.

g.      Concerning the March 16, 2021 referral, the lie that McKenzie "refuses to provide information about the doctor who is allegedly treating S.O." when that information was provided to NGUYEN and she had received medical records;

h.      The lie that McKenzie forbade NGUYEN from speaking with Dylan and that she was unable to verify the children's safety;

i.      The concealment of the fact there was no documentary support for the school nurse's alleged report that S.O.'s Body Mass Index was "very low for his age."

j.      The omission that NGUYEN had not followed protocols of the agency itself on investigating any existing medical records showing evaluations of S.O.; of course leaving out entirely the information included in McKenzie's text the day prior to applying for the warrant.

k.      The lie that McKenzie and Dylan "repeatedly refused offers of supportive services from multiple parties."

l.      The lie that the parents were considering homeschooling S.O. "in order to remove him from community oversight because they do not want to answer any more questions about his health."

m.      The fraudulent concealment that NGUYEN had never investigated whether W.O. was in any danger, whatsoever, or that she had any basis for seizing W.O.

n.      The lie that W.O. was at "substantial risk for neglect and/or abuse"

o.      The lie that CSA had made any effort, whatsoever, to mitigate any safety concerns *vis a vis* W.O.

COMPLAINT FOR CIVIL RIGHTS VIOLATION

110.   The warrant affidavit also contained irrelevant and prejudicial accounts of prior CSA referrals that were either evaluated out or unfounded for the wild and preposterous conclusions that McKenzie had a "pattern" of refusing to cooperate with supportive services offered by social services or that McKenzie and Dylan were "disproportionately fixated on S.O." and punishing and mistreating him.

111.   The foregoing list of misrepresentations and concealment of facts is based on the information presently known. Plaintiffs reserve the right to amend the foregoing facts upon further discovery and investigation, including of CSA's juvenile case files, which are confidential pursuant to California Welfare & Institutions Code §827 and California Rule of Court 5.552.

112.   Prior to its submission to the Court for authorization, NGUYEN and her supervisor ANDERSON discussed the affidavit to be submitted and agreed to its submission. Both NGUYEN and ANDERSON submitted the warrant application with the intention that the Superior Court, in granting the application, rely upon the factual misrepresentations therein and be deprived of the opportunity to consider the omissions of exculpatory information. At the time each misrepresentation was made, NGUYEN and ANDERSON knew of the falsity of each statement or were reckless with the truth of the matter asserted.

113.   The requested warrant was granted on March 22, 2021.

114.   The same day, NGUYEN went to the family residence to serve the protective custody warrant. Dylan answered the door. NGUYEN stated that all three children were being removed from the home.

115.   Dylan pointed out that the warrant only covered W.O and S.O, NGUYEN stated that M.D. was also being removed and ordered Dylan to produce all three children. Dylan was unable to do so as the children were with McKenzie and not home. NGUYEN told him that M.D. is being removed as well, and told DYLAN that if the parents did not surrender the children in 24 hours she would put out an Amber Alert and charge the parents with "kidnapping," and McKENZIE would be arrested.

116.   While NGUYEN and the police were there Dylan called Dr. Lee and left a voicemail about what was going on, and Dr. Lee called back minutes later.  Dylan told Dr. Lee in the message about the fact they were there to take the children and expressed frustration that he had not sent documents the parents had asked for since the day NGUYEN and MASON had come to the home.

117.   Dr. Lee asked to speak to NGUYEN right then and there, and Dylan handed NGUYEN the phone and the only thing Dylan heard her say was, "You can fax me the documents."  She then handed back to Dylan and said, "I don't care, it's too late now."

118.   Dr. Lee told Dylan and McKenzie later that night of March 22nd that he had sent NGUYEN S.O.'s medical records immediately after they had spoken, they contained S.O.'s genetic testing results, all prior visit notes with Dr. Lee, and a letter from Dr. Lee explaining his recommendations on the strict dietary controls. These records confirmed that S.O.'s weight was normal and that genetic testing had been conducted and that S.O. has genetic abnormalities that supported the doctor's medical recommendations.  They also showed that in the past the child's weight had qualified him as obese!

119.   Dr. Lee also told Dylan and McKenzie that when he had spoken to NGUYEN she told him, "I don't agree with your recommendations;" NGUYEN has not a single medical degree of any kind.

120.   On March 24, 2021, S.O.'s weight was 48.2 pounds as measured by the child's pediatrician at Golden Valley Health Center; this was an appointment McKenzie had set long before the circus began with NGUYEN and CSA. Again, this weight was well within the normal healthy BMI for children of S.O.'s age and stature. This report was also given to CSA social workers.

121.   NGUYEN and ANDERSON did not care about anything that Dr. Lee or the current BMI measurements said about S.O.'s actual healthy status.  That same day, March 24th, 2021, McKenzie and Dylan surrendered S.O and W.O. into CSA custody.

122.  McKenzie could not participate in the actual handing over of the children as she was hysterical and stayed in the home.  McKenzie was told by NGUYEN that M.D. had to go to his biological father.  Each of the children cried inconsolably as they were removed.

123.  Prior to seizing M.D., S.O., and W.O., none of the Defendants had conducted a reasonable investigation into the matter, including having the child S.O. examined by a medical doctor. None of the Defendants offered less intrusive alternative means for keeping the children safe from any perceived or alleged danger, short of seizing the children. None of the Defendants offered services that might have mitigated or negated the need to seize the children.

124.  W.O. and S.O. were transported to a foster home. That night, W.O., who was only 1 years old, cried all night. S.O. heard his baby brother crying and also could not sleep and was traumatized.

125.  On or about March 26, 2021, MUMMERT and POTTER filed a Juvenile Dependency Petition, under penalty of perjury, with the Juvenile Court. In the Petition, MUMMERT and POTTER made numerous misrepresentations and concealed exculpatory information in the possession of CSA, including:

a.  The omission of exculpatory fact that at no time was S.O. had anything other than a healthy weight per S.O.'s medical records and was never "underweight."

b.  The concealment of fact that Sylas had patches of red, dry skin because of eczema, which was being treated.

c.  The lie that S.O. had disclosed he received a "black bruise" from spankings he received.

d.  The lie that S.O.'s parents "utilize[d] food as a form of punishment."

e.  The concealment of a possible genetic condition that explained S.O.'s behaviors of hoarding food, lying about his food intake, and digging through trash for food.

f.  The lie that S.O.'s parents "have a pattern of removing S.O. from oversight by the community and relatives.

g.   The lie that S.O.'s parents were dishonest about S.O.'s prior medical history and counseling.

126.   Each said is misrepresentation and fraudulent concealment of exculpatory information in the Juvenile Petition was made jointly by MUMMERT and POTTER, following their review of the information gathered by CSA and agreement to sign and submit the Juvenile Petition, with the intention that the Juvenile Court would rely upon said perjured statements to continue the detention of the minor children.

127.   The same day, on March 26, 2021, social workers MUMMERT and PANNELL submitted a Detention Report, which also contained numerous misrepresentations and omissions of material facts, including a repetition of the deceit in the warrant affidavit. MUMMERT and PANNELL:

a.   Concealed the fact that at the time each referral was made concerning S.O., there were no medical records showing that S.O. was "underweight" or "malnourished." In fact, his BMI was healthy according to his medical records.

b.   Maintained the lie in the warrant affidavit that McKenzie refused to provide information concerning S.O.'s doctors, when all of that information had been provided to NGUYEN along with medical records.

c.   Lied that McKenzie could not recall the name of S.O.'s doctor in Ventura, when McKenzie and Dylan had provided the name and phone number to NGUYEN;

d.   Lied that S.O. was underweight as of 2019 when the family was in Ventura County when no medical records supported such finding;

e.   Lied that S.O. was not provided sufficient food to meet the requirements to maintain healthy growth because he had lost weight between 2019 and 2021, when, in fact, he had at all times maintained a healthy weight in 2021.

f.   Lied that McKenzie and Dylan had placed locks on the family refrigerators, which the child, himself, confirmed never happened.

128.   All of the foregoing misrepresentations and fabrications of evidence with knowledge of their falsity at the time made or with a reckless disregard for the truth.

129.   The Juvenile Court admitted the Detention Report into evidence in ordering the continued detention of the children from their parents.

130.   S.O. and W.O. would go on to spend part of their detention in foster care, before being placed with McKenzie's father, Robert Becker. M.D. remained detained in Austin Decker's care.

131.   On March 30th, 2021, social worker DIAZ came to ROBERT's home to talk to him about his receiving placement of the children W.O. and S.O. 205. When DIAZ came, she told ROBERT all of the following:

a.   He was not to talk to the parents in front of my grandchildren

b.   He was not to share anything that the parents might be doing with the grandchildren

c.   He was not to limit S.O.'s food intake in any way.

d.   If he had any concerns about S.O.'s health he should just take him to the doctor.

e.   If the doctor made a recommendation, follow the doctor's recommendation – ROBERT couldn't help pointing out to DIAZ that is exactly what his daughter and her husband had done

f.   He was not to advise the parents of S.O.'s appointments or trips to the doctor. G) He was told he could not take the children to any other person's household – which of course would then include their paternal grandparents – until they had been "cleared" by CFS.

132.   Each of the children remained out of the care of McKenzie and Dylan until April 13, 2021. The day prior, CSA notified the parties of their intent to dismiss the Petition. Although they offered "services" as part of the dismissal, McKenzie and Dylan did not agree to any conditions for dismissal.

## DAMAGES

133.   As the result of the conduct of Defendants, Plaintiffs have suffered severe emotional distress, anxiety, and general and severe damage to their psyche and mental health, and are certain to experience same in the future, to such an extent as to cause physical manifestations.  They have suffered sleep disturbance, diet disturbance, tremendous weight

loss and loss of enjoyment of life.  They have suffered reputational harm, and now harbor a deep fear of law enforcement and authority figures.

A) W.O., who was only 1 years old at the time of separation has developed separation anxiety, did not want to leave McKenzie's arms, and does not want his parents to be out of sight and those conditions remain; the child is psychologically permanently scarred.  While at the grandfather's home W.O. repeatedly called out for his "momma" and "dadda". W.O. appeared fearful of going to sleep and refused to sleep in a crib. On occasion, W.O. would wake up screaming and in a panic. W.O. also developed a fear of strangers and is untrusting, including of extended family members.  W.O. still suffers from extreme hypervigilance, never sure when again his parents might go missing.

B.) S.O. has become guarded, quiet, and fearful of talking to others. He has trouble developing friendships. S.O. also started having bouts of rage and anger. S.O. has lost trust in others and is also fearful of separation from his parents.

C.) M.D. has battled feelings of rejection and resentment over the separation from his siblings. While he was out of his parent's care, M.D. refused to eat and cried every day, begging to go back home. M.D. also developed issues with trusting others.  M.D. also cried daily, called and messaged Dylan and McKenzie asking to come home and Easter of 2021 was the first and only holiday he had spent apart from his mother McKenzie.

D.) McKenzie was diagnosed with depression, PTSD, and anxiety after the removal of her children. She suffered from loss of appetite, sleeplessness, and panic attacks. McKenzie found herself crying throughout the day. She has been prescribed medication, including anti-depressants and sleep medication. As with the other family members, McKenzie has developed difficulty trusting in others. For a while, every time that McKenzie heard the doorbell, she would have a panic attack. Even to this day, she feels a high level of stress when she so much as receives a telephone call from an unknown number with a 209 area code. McKenzie also became fearful of being alone.

E.)  Dylan has also been diagnosed with depression, anxiety, and PTSD. Dylan also lost his job as a result of crying throughout the day and inability to perform work. Dylan

also developed insomnia, feelings of helplessness, and anger that he was unable to protect his family.  Dylan relapsed after 8 ½ years of sobriety as a result of this removal, and lost his job, literally unable to work for periods of time due to uncontrollable crying on the job.

134.   Both parents also claim loss of wages past and future, and special damages in the retention of legal counsel to assist them in defending the fraudulent claims raised in the subsequent to removal juvenile dependency proceedings, and seek recovery of same.  CSA personnel unknown (Doe 6), placed both McKenzie and Dylan on the Child Abuse Central Index, which keeps Dylan from participating in his son's sporting events as a coach and McKenzie from continuing in her chosen field of education as a teacher.

135.   Plaintiffs seek recovery of exemplary (punitive) damages due to the wrongful conduct of Defendants, conducted maliciously and/or with reckless disregard as herein alleged in the hope to deter them and others similarly situated from such conduct in the future.

**FIRST CLAIM FOR RELIEF**

**WARRANTLESS SEIZURE – Procedural Due Process**

(McKenzie, M.D. against NGUYEN, ANDERSON, and Does 1 through 10)

136.   Plaintiffs McKenzie and M.D. incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

137.   By ordering a change in custody of M.D. from McKenzie to Austin Decker, Defendants NGUYEN and ANDERSON violated McKenzie and M.D.'s procedural due process rights entitling them to notice and the opportunity to be heard by a neutral and detached judicial officer pursuant to the 14th Amendment to the U.S. Constitution.

138.   Said Defendants committed these unconstitutional acts without proper justification or authority, without probable cause, and without any specific evidence to suggest that the M.D. was in imminent danger of serious bodily injury or death at the hands of his mother, McKenzie.

139.   At the time of said detention, said Defendants, and each of them, had not conducted a reasonable investigation into the circumstances of M.D. and his family, a required first step

by any government actor contemplating the separation of a child from a parent under long standing 9th Circuit precedent commencing at least with *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th. Cir. 2000). Thus, Defendants knew or should have known that McKenzie and M.D. were entitled to notice and an opportunity to be heard before the removal of M.D. from McKenzie's care, custody, and control.

140.   Plaintiffs McKenzie and M.D. incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134 as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the named Defendants conduct set forth hereinabove.

141.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraph 135 as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief.

## SECOND CLAIM FOR RELIEF

### WARRANTLESS SEIZURE – Substantive Due Process (14th Am. – McKenzie / 4th Am. – M.D.)

(By McKenzie and M.D. against NGUYEN and Does 1 through 10)

142.   Plaintiffs McKenzie and M.D. incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

143.   By ordering the removal of M.D. from McKenzie without conducting a reasonable investigation or seeking court authorization, Defendants violated McKenzie's Fourteenth Amendment substantive due process right to the care, custody, and control of M.D. Defendants also violated M.D.'s corollary Fourth Amendment right to be free of unwarranted search and seizure and to enjoy the companionship and care of his mother.

144.   At the time of the removal, Defendants possessed no information or evidence that M.D. was in danger of suffering severe bodily injury or other serious harm from McKenzie. The removal of M.D. from McKenzie was deliberate and undertaken with a reckless indifference to McKenzie's parental rights over her child, M.D., and of M.D.'s right to be with his mother.

145.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134 as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the named Defendants conduct set forth hereinabove.

146.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraph 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief.

### THIRD CLAIM FOR RELIEF

### FABRICATED EVIDENCE – Substantive Due Process (Warrant Affidavit)

(By McKenzie, Dylan, S.O. and W.O. against NGUYEN, ANDERSON, and Does 1 through 10)

147.   Plaintiffs McKenzie, Dylan, S.O. and W.O. incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

148.   Said Plaintiffs allege that NGUYEN and ANDERSON deliberately fabricated evidence against Plaintiffs, and that as a result of this evidence in an application for protective custody warrant being used against them, Plaintiffs suffered continued deprivation of their right to family association under the Fourteenth Amendment to the United States Constitution.

149.   Said misrepresentations and fraudulent omissions are described hereinabove at paragraph 109.

150.   At the time each misrepresentation was made, NGUYEN and ANDERSON knew the statements were not true or acted in reckless disregard by including representations for which they had no knowledge were true or false or a misrepresentation of facts. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the object of misleading the Superior Court of California to issue a warrant.

151.   As a result of NGUYEN and ANDERSON's fraudulent and perjured statements, Plaintiffs McKenzie and Dylan were separated from their children, W.O., S.O. and M.D.

152.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

153.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth herein above.

## FOURTH CLAIM FOR RELIEF

### FABRICATED EVIDENCE – Substantive Due Process (Juvenile Petition)

(By McKenzie, Dylan, S.O. and W.O. against MUMMERT, POTTER, and Does 1 through 10)

154.   Plaintiffs McKenzie, Dylan, S.O. and W.O. incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

155.   Plaintiffs allege that MUMMERT and POTTER deliberately fabricated evidence against Plaintiffs, and that as a result of this evidence in Juvenile Dependency Petition, McKenzie, S.O., and W.O suffered continued deprivation of their right to family association under the Fourteenth Amendment to the United States Constitution.

156.   Said misrepresentations and fraudulent omissions are described hereinabove at paragraph 125.

157.   At the time each misrepresentation was made, said Defendants knew the statements were not true or acted in reckless disregard by including representations for which they had no knowledge were true or false or a misrepresentation of facts. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the object of misleading the Superior Court of California to continue the detention of S.O. and W.O. from their parents.

158.   As a result of MUMMERT and POTTER's fraudulent and perjured statements, Plaintiffs McKenzie and Dylan were separated from their children, W.O. and S.O.

159.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

160.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth herein above.

## FIFTH CLAIM FOR RELIEF

### FABRICATED EVIDENCE – Substantive Due Process (Detention Report)

(By McKenzie, Dylan, S.O. and W.O. against MUMMERT, PANNELL, and Does 1 through 10)

161.   Plaintiffs McKenzie, Dylan, S.O. and W.O. incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

162.   Said Plaintiffs allege that MUMMERT and PANNELL deliberately fabricated evidence against Plaintiffs, and that as a result of this evidence in an application for Detention Report being used against them, Plaintiffs suffered continued deprivation of their right to family association under the Fourteenth Amendment to the United States Constitution.

163.   Said misrepresentations and fraudulent omissions are described hereinabove at paragraph 127.

164.   At the time each misrepresentation was made, said Defendants knew the statements were not true or acted in reckless disregard by including representations for which they had no knowledge were true or false or a misrepresentation of facts. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the object of misleading the Superior Court of California to continue the detention of S.O. and W.O. from their parents.

165.   As a result of Defendants' fraudulent and perjured statements, Plaintiffs McKenzie and Dylan were separated from their children, W.O. and S.O.

166.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

167.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth herein above.

<u>**SIXTH CLAIM FOR RELIEF**</u>

***MONELL***

(By All Plaintiffs against COUNTY)

168.   Plaintiffs incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

169.   COUNTY, including through its CSA entity is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. (*Monell v. Dept. of Social Services* (1978) 436 U.S. 658.)

170.   COUNTY, including through its CSA entity, had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices which respect citizens constitutional rights guaranteed as in this case to Plaintiffs under the United States Constitution, including those rights derived from the 4th and 14th Amendments.

171.   The rights implicated in said regard as to these Plaintiffs' claims include without limitation certain rights of procedural due process, such as the right to receive notice and be provided the time to be heard by a neutral detached magistrate or judicial officer about any actions implicating a fundamental liberty interest. These are in addition to the over-arching procedural rights of notice/opportunity to be heard, and they are various

COMPLAINT FOR CIVIL RIGHTS VIOLATION

substantive rights related to familial association that includes non-interference by government actors with decision making authority related to the care, custody, and control of one's children, as well as rights of privacy, and the right to be free from retaliation and coercion by government actors to obtain waivers of other constitutional rights.

172.   COUNTY had lawful duties of providing training, and adequate training of their employees in any COUNTY entity, and through such training ensure protection of the aforementioned constitutional rights, and ensure that COUNTY actors do not act in deliberate indifference to the Plaintiffs' constitutional rights or coerce citizens such as Plaintiffs to waive their rights based on some threatened action that the social worker has no legal authority to actually take.

173.   COUNTY further has a duty to supervise and occasionally audit or inspect whether their employees are in fact following all lawful procedures and take steps to remedy whatever deficiency in following the law by individual employees that comes to the COUNTY's attention, then meting out such discipline as is necessary to avoid ongoing violations of law in commonly occurring and recurring contexts within which COUNTY employees find themselves in conducting their work. The COUNTY failed miserably in this regard, and had persons themselves lacking knowledge of the applicable federal law, constitutional law, state law and regulations, and at times lacking knowledge of the CSA's own policies and practices.

174.   COUNTY has a policy, custom, or practice of including false allegations, exaggerating partially-true allegations into misrepresentations, omitting material facts, and excluding exculpatory information in juvenile dependency petitions, warrant applications, and juvenile court reports (e.g., detention, jurisdiction, and disposition reports) filed by SWs and supporting staff in the juvenile courts that result in the initial, unlawful detention of minor children and the continued detention of such children once juvenile process begins. This is what happened in this case based on the foregoing allegations. Lies, misrepresentations, and omissions of material and exculpatory facts were replete in the application for the protective custody warrant submitted by NGUYEN with the approval

and review of ANDERSON, and in the Petition and Detention Reports filed by
MUMMERT, POTTER, and PANNELL as described hereinabove.

175.   COUNTY has a policy, practice, or custom authorizing and/or ratifying without
discipline, threat of discipline, or reprimand of social workers and/or their supervisors, the
repeated removal of children from their parents or guardians in the absence of probable
cause, without a warrant, consent, or imminent risk of serious bodily injury to children,
taking children when there are less intrusive means of protecting them from whatever the
SWs' perceived imminent risk of serious bodily injury to the children might be, and for
which the result of said policy has been thousands of lawless removals of children from
parents and/or the separation of children from parents in Stanislaus County over the past
several years. Such policies, practices, and customs result in violations to the Fourth and
Fourteenth Amendment rights guaranteed to parents and children.

176.   This policy, practice, or custom, has been the moving force behind the removals in
the following families known to Plaintiffs: (1) Angelina Nunes and Emanuel Alves (July
2016), (2) Leah and Serena Ford, (3) Jeremy Westfall and Taylor Webb, (4) Leann Santo,
and (5) Emannuel and Makeda Wyatt.

177.   This policy, practice, or custom was the moving force behind the actions of
NGUYEN and ANDERSON in "ordering" McKenzie that M.D. would be removed from
her and put in the care of his biological father.

178.   COUNTY has a policy and/or unwritten practice or custom of removing all children
from a household parents whenever SWs remove a single child from that household ("Take
One, Take All" policy). The Take One, Take All policy has resulted in the removal of other
children by COUNTY. On May 9, 2018, after the sudden death of one of non-party Leann
Santor's children (from natural causes, not abuse or neglect), COUNTY removed her
remaining children despite the facts that there was no imminent risk to their health, there
was no probable cause to support such removal, and the presence of alternative, less-
restrictive means to address whatever concerns CFS claimed it had. The policy also

resulted in the removals of children—without probable cause or exigency—from Angelina Nunes and Emanuel Alves (July 2016) and Leah and Serena Ford.

179.   This policy, practice and custom was the moving force behind the inclusion of W.O. in the application for a protective custody warrant filed by NGUYEN and ANDERSON, who filed the application knowing there was not a single allegation of any kind of abuse or neglect of W.O., and also the moving force behind the forced separation without a warrant, of M.D. from his mother McKenzie.

180.   Pursuant to the COUNTY's policies, practices, and customs, the social workers who prepare juvenile dependency petitions are not required to conduct any personal investigation into the facts, legal claims, and allegations of abuse/neglect levelled against the parents that their petitions necessarily must include to initiate dependency proceedings—despite the fact that the petitions must be sworn, under oath and submitted to the juvenile court. The absence of any investigation by social workers these social workers, combined with the routine practice of lying, making material omissions of fact, omitting exculpatory material, and inflating and exaggerating allegations, apply to the petition-drafting process, as well as the processes for drafting other numerous documents in juvenile dependency proceedings. In the context of preparing petitions, this deceptive exaggeration and omission of information that would wholly or significantly refute the allegations contained in the petitions allows CSA to create a leveraged situation for settlement discussions with parents (wherein there are increased opportunities to get the parent or parents to agree to "lesser" charges in exchange for submitting to continued jurisdiction by the juvenile court and therefore continued CSA involvement in the family's lives, and the stream of federal funding that goes along with it), occur as a matter of practice and custom and is but another of the unconstitutional practices and customs of COUNTY.

181.   These policies, practices, and customs, were the moving force behind the submission of a fraudulent application for a protective custody warrant by NGUYEN and ANDERSON, and was further the moving force behind the submission of a Petition and

Detention Report that was filled with fraud and misrepresentations, and submitted with omissions of material and exculpatory facts by these Defendants.

182.   Plaintiffs allege the COUNTY has failed to train its employees on the scope, nature, and importance of the Fourth and Fourteenth Amendment protections for familial association, issues that arise routinely in child welfare investigations, including, but not limited to the following:

      a.   the procedural due process right to have notice and the opportunity to be heard;

      b.   the constitutional rights and liberty interests of a parent to care for his/her child without unreasonable government interference, and the reciprocal rights of a child to same;

      c.   the existence and relevance of federal laws and precedent on the removal of children from their parents / guardians in the context of an investigation of a child abuse or neglect referral, and;

      d.   the prohibition under federal law against the inclusion—within juvenile court filings—of false statements, misrepresentations of evidence, and omitting exculpatory information that may be clarifying or mitigating to one or more allegations or statements of fact for purposes of securing removal, extending juvenile court proceedings, and continued detention during the pendency of such proceedings.

      e.   The nature and extent of the physical, emotional, and psychological harm that removal of children causes parents and the children, including but not limited to, (1) the permanent and untreatable emotional and  physiological damage to children and life-long sequalae of emotional and psychological instability of children separated from their parent(s), (2) the nature of the aforementioned damage as being physically measurable in regards to physical changes in children's developing brains as seen in the impairment of neurons and neurological receptor conductivity in the brain, and diminished growth of both grey and white matter in their brain, (3) the importance of the parent-child

bond that is disrupted by removal and/or separation from parent(s), to the long term behavioral, emotional, and psychological function of [a/the] child[ren] passing through infancy, youth, adolescence and adult hood, and inclusive but not limited to the effect of the child[ren]'s ability to form lasting emotional bonds with friends, family, lovers and spouses, in addition to the panoply of individuals encountered in a lifetime such as teachers, and coaches, pastors, and mentors, for whom children damaged in the way complained of above, cannot learn and grow and achieve their highest and best human achievement because they cannot achieve any semblance of an intimate emotional bond with those individuals, and, (4) the depths of depression, despair, anxiety, anger, and grief visited upon parents of child[ren] removed by COUNTY and the long term effects of that experience on their ability to function emotionally and psychologically, to trust government authority, and to feel safe and secure in their homes and families.

183.   This non-existent or wholly inadequate training was the moving force behind the constellation of constitutionally violative choices taken by all the individually named Defendants hereinabove, leading to the violations of the Plaintiffs constitutional rights of familial association and damaging each and every of them for life.

184.   Plaintiff incorporates by reference as though fully set forth herein, the damages specified in paragraphs 133 and 134 as they apply to Plaintiffs claims for damages for the violation of the constitutional rights specified in the other constitutional-violation based Claims for Relief, as the COUNTY's failures in training and in allowing unconstitutional practices to continue unfettered were the moving force behind the actions of the individual COUNTY employee-defendants.

### SEVENTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT – Warrantless Seizure

(By M.D. against NGUYEN, ANDERSON, COUNTY, and Does 1 through 10 inclusive)

185.  Plaintiffs incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

186.  On March 22, 2021, Defendants intentionally deprived M.D. of the freedom of movement through forcible seizure, transportation, and detention and/or conspired with and agreed with one another to commit the same, such that all said defendants are responsible for the resulting harm.

187.  M.D. did not consent to the seizure, transportation, and detention.

188.  Defendants, and each of them, did not have judicial authorization to seize and detain M.D. Further, the seizure of each of M.D. was not supported by exigent circumstances.

189.  As a direct and proximate result of these Defendants' misconduct, M.D. has suffered, and will continue to suffer, general and special damages according to proof at trial.

190.  Plaintiff incorporates by reference as though fully set forth herein, the damages specified in paragraphs 133, as they apply to Plaintiff' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

191.  Plaintiff incorporates by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiff's claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth herein above.

## EIGHTH CLAIM FOR RELIEF

### FALSE IMPRISONMENT – Seizure with a Fraudulent Warrant

(By S.O. and W.O. against NGUYEN, ANDERSON, and COUNTY)

192.  Plaintiffs incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

193.  Defendants procured a protective custody warrant authorizing the seizure of minors, W.O. and S.O. from the care and custody of their parents, McKenzie and Dylan through the use of perjured statements and fraudulent omissions of fact as described hereinabove.

194.   Defendants seized and/or intentionally caused the seizure of Plaintiffs from the care, custody, and control of their parents, McKenzie and Dylan.

195.   As a result, each of the Plaintiffs were harmed and Defendants' conduct in procuring and executing the custody warrant was a substantial factor in causing Plaintiffs' harm.

196.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 133, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

197.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth herein above.

## NINTH CLAIM FOR RELIEF

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(By All Plaintiffs against NGUYEN, ANDERSON, MUMMERT, PANNELL, COUNTY, and Does 1 – 10, inclusive)

198.   Plaintiffs incorporate by reference paragraphs 1 through 135, as if set forth fully herein.

199.   On March 22, 2022, Defendants ordered the separation of M.D. from the care and custody of his mother, McKenzie without her consent, court order, or exigent circumstances.

200.   On March 24, 2022, Defendants intentionally seized, transported, and detained W.O. and S.O. from the care and custody of their parents, McKenzie and Dylan without consent and based on a custody warrant procured through the use of fabricated evidence, or aided and abetted, or conspired, or allowed the same to be committed.

201.   In doing so, each Defendant intentionally caused or acted with reckless disregard of the possibility of severe emotional distress to Plaintiffs.

202.   As a direct and proximate result of these Defendants' misconduct, these Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial.

203.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 134 and 134, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

204.   Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 135, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendants conduct set forth hereinabove.

## **<u>JURY TRIAL DEMAND</u>**

205.   Plaintiff demands a jury trial on each Claim for Relief set forth above.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT FOR CIVIL RIGHTS VIOLATION

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as

follows:

- General damages and special damages according to proof;

- As against the individual defendants only, punitive damages as

allowed by law;

- Attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other

appropriate statutes or decisional law allowing for the recovery of

attorney fees and costs against Defendants;

- Such further relief as the Court deems just and proper.


Dated: 5/3/2022                     SAMUEL H. PARK, ATTORNEY AT LAW


                         By:    /s/ Samuel H. Park_____
                                Samuel H. Park,
                                Attorney for Plaintiffs,
                                McKenzie Olivares, Dylan Olivares, W.O., S.O.,
                                and M.D.

COMPLAINT FOR CIVIL RIGHTS VIOLATION